**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

UNITED STATES OF AMERICA

-vs-                                                    Case No:2:09-cr-85-FtM-36SPC

MARIA ELENA GIRALDO

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

On October 14, 2009, the Grand Jury returned an eighteen (18) count Indictment against the Defendant Maria Elena Giraldo, in violation of 18 U.S.C. §§ 1343, 1349, 1014, 1957, and 2. The Government alleges the Defendant recruited straw borrowers for fraudulent loans, falsified mortgage applications by giving fraudulent monthly income amounts, false statements of real estate owned, false employment verification forms, false federal income tax returns, false statements regarding the ownership of real estate, and false sources of available funds, wire fraud by causing the fraudulently obtained loans to be funded via interstate wire transfers, and intent to devise a scheme to defraud Fifth Third Mortgage and Fifth Third Bank. The Government alleges in the Indictment, that the Defendant fraudulently engaged in a monetary transaction by and through a financial institution affecting interstate commerce in criminally derived property of a value greater than $10,000.00. In total, the Indictment, Counts I-VIII, allege the Defendant fraudulently obtained loans amounting to $6,126,611.89.

This matter comes before the Court on the Defense Counsel's suggestion that the Defendant is not competent to stand trial for the allegations alleged in the October 14, 2009 Indictment. The

competency hearing was originally set for January 10, 2011, was continued to January 18, 2011, and further postponed until the Defendant could obtain an expert competency report.

On March 3, 2011, Defense Counsel filed a Motion for Competency Hearing (Doc. #43). In the Motion, Counsel stated they had secured the services of Dr. Alexander Paret to conduct a psychological examination of the Defendant for the purposes of determining competency to stand trial. Counsel indicates according to the evaluation report submitted to the Government, the Defendant is incompetent to stand trial.

On March 7, 2011, the District Court held a hearing on the status of the Defendant's competency evaluation. The Government requested time to secure a Spanish speaking psychologist or psychiatrist and to file the instant Motion for Competency Evaluation. On March 17, 2011, the Government moved the Court for a Psychological Examination to Determine Competency which was subsequently granted by the District Court. On July 12, 2011, the District Court granted the Motion for a competency hearing originally filed on March 3, 2011. The matter was then referred to the undersigned to hold a hearing.

A one day hearing was held on September 8, 2011, to determine whether the Defendant is competent to stand trial and assist in her own defense. The Government was represented by Assistant United States Attorney, Jeff Michelland. The Defendant was present and represented by the Federal Public Defender, Donna Elm. The Defense called Dr. Alexander J. Paret, Ph.D as her expert witness and submitted into evidence Dr. Paret's Curriculum Vitae (CV), Dr. Paret's psychological evaluation report and a copy of the Defendants's Design Fluency Test results. The Government called Dr. Cristina Nodar Miller, Psy.D as its expert witness and submitted her CV and psychological evaluation report .

**STANDARD OF REVIEW**

"Unquestionably, due process requires a defendant to be competent to stand trial." U.S. v. Derisma, 2011 WL 3878367 *1 (M.D. Fla. June 27, 2011) (citing U.S. v. Andrews, 469 F.3d 1113, 1117 (7th Cir.2006) (quoting U.S. v. Collins, 949 F.3d 921, 924 (7th Cir.1991)). *See also* Cooper v. Oklahoma, 517 U.S. 375, 384–85, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process.") (internal quotation and citation omitted); Eddmonds v. Peters, 93 F.3d 1307,1314 (7th Cir.1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.").

Incompetency means "suffering from a mental disease or defect rendering [defendant] mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The Defendant assumes the burden of proof to establish his incompetency by a preponderance of the evidence. Derisma, 2011 WL 3878367 at *1 (citing Cooper, 517 U.S. at 355); Battle v. U.S., 419 F.3d 1292, 1298 (11th Cir.2005); Carter v. U.S., 2:09–CV–444–FTM–29DNF, 2010 WL 1480365 *3 (M.D. Fla. Apr. 6, 2010). The Defendant is entitled to no presumption of incompetency. Id. "The legal test for competency is whether the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.' " U.S. v. Cruz, 805 F.2d 1464, 1479 (11th Cir.1986) (quoting Dusky v. U.S., 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)). "[T]he mere presence of a mental disease or defect is not sufficient to render a defendant incompetent ...." U.S.

v. Rothman, No. 08–20895–CR, 2010 WL 3259927 at *7 (S.D.Fla. Aug. 18, 2010) (citing U.S. v. Liberatore, 856 F. Supp. 358, 360 (N.D. Ohio 1994)). "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." U.S. v. Williams, 2007 WL 1655371 at * 5 (M.D. Fla. June 7, 2007) (internal citation and quotation marks omitted); see also Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995) (noting that "not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted).

Psychiatric and psychological examinations are governed by 18 U.S.C. § 4247(b), which provides in pertinent part:

> A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner. Each examiner shall be designated by the court....
>
> Pursuant to 18 U.S.C. § 4247(c), report of examination shall include:
>
> (1) the person's history and present symptoms;
>
> (2) a description of the psychiatric, psychological, and medical tests that were employed and their results;
>
> (3) the examiner's findings; and
>
> (4) the examiner's opinions as to diagnosis, prognosis, and
>
> (A) ... whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Once there is an evaluation, the proceedings are governed by 18 U.S.C. § 4241(d), which provides that if, after a hearing, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General .... for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Derisma, 2011 WL 3878367 at *3.

In determining whether the defendant has sufficient present ability to consult with her lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel. Derisma, 2011 WL 3878367 at *3 (citing U.S. v. Passman, 455 F.

Supp. 794, 796–97 (D.D.C.1978) (citations omitted). "In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him." <u>U.S. v. Makris</u>, 535 F.2d 899, 908 (5th Cir.1976).[1] "In determining a defendant's competency to stand trial, the Court may rely one of two competing competency opinions given by qualified experts." <u>U.S. v. Gerlt</u>, 2011 WL 110790 * 1 (W.D. Mo. Jan.13, 2011) (citing <u>U.S. v. Ghane</u>, 490 F.3d 1036, 1040 (8th Cir.2007)).

"[A] criminal defendant must lack either 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.' " <u>U.S. v. Miller</u>, 531 F.3d 340, 350 (6th Cir.2008) (quoting <u>Drope v. Missouri</u>, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)). "In determining competency, the district court may rely on numerous factors, including expert medical opinions and the court's observation of the defendant's demeanor. Low intelligence or a mental deficiency does not render a defendant incompetent per se." <u>Derisma</u>, 2011 WL 3878367 at *3 (citing <u>U.S. v. Robinson</u>, 253 F.3d 1065, 1068 (8th Cir.2001) (internal citations omitted).

In <u>United States v. Hogan</u>, 986 F.2d 1364, 1373 (11th Cir.1993), for example, the Eleventh Circuit Court of Appeals noted that even perfectly competent defendants often do not fully comprehend the intricacies of some of the theories offered by their lawyers, and stated, "all that is required is that [the defendant] had a rational as well as factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree

---

[1] All decisions of the Fifth Circuit prior to October 1, 1981, have been adopted as decisions of the Eleventh Circuit. <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1209 (11th Cir.1981).

of rational understanding." Derisma, 2011 WL 3878367 at *4; *See also* Median v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995) (stating neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial). The Court reviews the evidence in this case with these standards in mind.

## Expert Testimony

Defendant was evaluated by defense expert Dr. Alexander J. Paret, PhD., and by Government expert Dr. Christina Nodar Miller.

### *Defense Expert Dr. Alexander Paret*

Dr. Paret is a clinical and forensic psychologist. (Tr. 6). The Government stipulated to the witness' expertise. (Tr. 15). Based on his credentials, the Court declared Dr. Paret an expert in the fields of forensic and clinical psychology.[2] (Tr. 15). Dr. Paret reviewed Defendant's records, as well as his own evaluations in this case. (Tr.18-21).

Dr. Paret performed Defendant's competency evaluations, beginning with malingering testing. The purpose of this testing is to determine whether Defendant is "faking cognitive deficits or ...pretending that [she] does not remember," in order to obtain secondary gain, and render herself competent or incompetent to stand trial. (Tr. 16-18). Malingering would cause anything said in the

---

[2] Dr. Paret obtained a bachelor's degree from Rollins College, double majoring in biology and chemistry. (Tr. 9). He then received his Master's degree from Rollins College in the field of clinical counseling, psychology. (Tr. 9). In 2007, Dr. Paret obtained a doctorate degree in both clinical and forensic psychology through a joint degree program at Pacific Graduate School of Psychology and Stanford University. (Tr. 6). He graduated with honors, obtaining a 3.7 GPA. (Tr. 7). While attending this doctorate program, he received additional training in forensic interviewing specific to juveniles and adults in May 2007. (Tr. 7-8). Currently, he is attending New Mexico State University, in pursuit of a psychopharmacology degree. (Tr. 7). While enrolled, he was trained in forensic evaluations specific to malingering. (Tr. 7). He has been working in the field of psychology since 1996 and is licensed to practice in new Mexico and Illinois. (Tr. 9). After extensive field work in state and private institutions, (see Tr. 11-13), Dr. Paret opened his own practice, dealing specifically with forensic evaluations, where he provides competency evaluations for adolescents, juveniles, and adults. (Tr. 13). Currently, he works in Illinois establishing a forensic practice and providing therapy. (Tr. 14). Dr. Paret is fluent in both Spanish and English. (Tr. 15).

clinical interview or any of the test results to be invalid. (Tr. 18). Dr. Paret testified that after administering two (2) tests, specifically the Rey 15 Items Test and the Test of Memory and Malingering (TOMM), Defendant "was not over feigning cognitive deficits or faking memory deficits; therefore, she was not malingering." (Tr. 18-19).

Dr. Paret also administered the Miller Instrument Test, which looks at the over exaggeration of psychotic symptoms in a forensic field, and testified that the Defendant was not over exaggerating at the time this test was given. (Tr. 20). The second step in Dr. Paret's evaluation was a formal clinical interview with the Defendant. (Tr. 21). He testified that the Defendant was sharing information during this interview that was, "very relevant to the type of question that the referral was asking." (Tr. 23). After this interview, Dr. Paret conducted a mental status exam and report, which looks at psychological concerns and symptoms, and is done by deducing information from the manner in which a person answers questions during the interview. (Tr. 24).

Additional standard tests were performed, including the administration of the Delis-Kaplan Executive Function System Test (D-KEFS) during Defendant's second appointment with Dr. Paret. (Tr. 26). This test can determine whether a defendant has the, "inability to choose, [or the] inability to have cognitive switching or perhaps to have perseveration, which is a psychotic symptom, that you do the same thing over and over." (Tr. 25-26). In his testimony, Dr. Paret stated that he conducted the Design Fluency Test, one within the D-KEFS bracket, and upon completion he determined that the Defendant was able to perform well during fairly easy and fairly difficult trials, and failed, or perseverated, during a moderately difficult trial that was not "overly complicated." (Tr. 27). Specifically, her scores during the Design Fluency Test Condition 1 were borderline, but not extremely low. (Tr. 30-31). On Condition 2, Defendant showed signs of perseveration, and on

Condition 3, the most complicated of the trials, Defendant performed rather well with an "average score", when required to complete the task with greater concentration. (Tr. 32).

Dr. Paret testified that overall, the tests followed the sequence of an IQ test, which is part of the Wechsler Adult Intelligence Scale (WAIS), which is the WAIS III in Spanish. (Tr. 35-36). Further, Dr. Paret testified that all examinations were done using nonverbal tests because of Defendant's inability to be given anything that is written in English. (Tr. 36). Thus, according to Dr. Paret, all the testing is valid. (Tr. 36).

In terms of testing for delusions, Dr. Paret stated that a disorder with heavy delusional aspects would show up on competency testing. (Tr. 36). On the second day of testing, Dr. Paret administered another (more extensive) clinical interview, and found that Defendant was consistently and highly delusional on both days of interviewing. (Tr. 37). Dr. Paret also uses the clinical interview to test for competency to stand trial (Tr. 37). The purpose of this stage in his evaluation is to administer a subjective test which looks at a defendant's ability to answer questions reliably and how they manifest their answers. (Tr. 38). Dr. Paret affirmed in his testimony that, "[p]ersons who are highly functional, even if they are psychotic, can understand and have knowledge of the [legal] process." (Tr. 39). Dr. Paret also found during his evaluation that the Defendant,

> did not have a factual understanding of what she was being charged with. She did not have a rational understanding of the legal proceedings and she was not able to assist defense counsel in the presentation the way that she presented in front of me. (Tr. 39)

This was found by evaluating Defendant's statements in response to interview questions. (Tr. 34). Specifically, Defendant was unable to articulate her charges other than expressing that she was charged with money laundering. (Tr. 39). Further, in assessing the factual and rational understanding

of the legal process, Dr. Paret testified that when answering questions about the courtroom, Defendant became tangential (going off on tangents) with loose associations. (Tr. 42-43). This means that she was not able to produce a linear thought process, and has two different types of thought processes which are systemically woven together. (Tr. 43). Dr. Paret stated that a defendant with these types of restrictions, is "not able to assist defense counsel because they lack the ability to have a rational conversation with someone that is assumably trying to help them," creating a difficult time for defense counsel to understand what a defendant is trying to articulate. (Tr. 44). Also hindering Defense Counsel's case would be Defendant's clinical evidence of perseveration and delusions. (Tr. 44-45).

In response to Counsel's questioning about functionality of people with delusions, Dr. Paret testified that people with delusions can be extremely functional. (Tr. 47). He stated that the Defendant is a highly functioning individual "[who is] able to drive a car, use a cell phone, go to 7-Eleven and purchase a coke." (Tr. 47-48). "She has her feet on the ground in reality, and her delusions are reality based as well." (Tr. 48). Dr. Paret also stated that fixed by definition, delusions are impervious to reality checks and a person will adhere to them as if they are ultimately the truth (Tr. 49); however in this case, Dr. Paret has not seen a psychotic break in Defendant as a result of her delusions. (Tr. 50).

With regard to the report prepared by Dr. Paret in response to his clinical interviews, he states that a number of the Defendant's delusions were religious in content, and a number of her grandiose ideas were tied to inflated self-worth, power and knowledge. (Tr. 52). He also reported that Defendant referred to herself as genius and successful, and devised a plan to repay the American debt by legalizing the 24 million undocumented individuals and making Albuquerque the capital of the

world. (Tr. 52-53). Given Dr. Paret's background, he was able to assess that there is a reality to what it is that she's saying, but also that contradictions occurred in her answers. (Tr. 54).

Dr. Paret believes that Defendant was not trying to fake that she was mentally ill. (Tr. 55). Ultimately, his clinical conclusions determined that Defendant, "does not have a factual understanding of the criminal proceedings, she does not have a rational understanding of the criminal proceedings and she's unable to assist defense counsel." (Tr. 58).

After examining Defendant's medical history, Dr. Paret testified that Defendant does not have any previous diagnoses of personality disorders. He also specifically ruled out narcissistic disorder on Axis II due to lack of information, along with a negative prognosis for all other disorders on Axis II. (Tr. 64-65). However, he gave Defendant an Axis I diagnosis, of schizophrenia, and found it was atypical. (Tr. 65). During his interviews, Dr. Paret did not see any evidence of pressured speech, which is an urgency to share as much information as possible in a limited amount of time. (Tr. 66). Dr. Paret testified Defendant sought psychological treatment in one instance where she reported symptoms of depression and anxiety. (Tr. 67). Defendant also indicated that she may have had a traumatic incident prior to the diagnosis of depression and post traumatic stress disorder (PTSD). (Tr. 68). However, Dr. Paret did not diagnose Defendant with any of those disorders when he examined her. (Tr. 69).

According to Dr. Paret's testimony, he reviewed Dr. Christina Nodar Miller's report, which stated that she also performed a clinical interview, records review and did clinical testing. (Tr. 69). He agreed that she performed other tests that are part of the forensic standard in the battery, including the MMPI, which is the standard test for certain types of psychoses and personality traits. (Tr. 70). After examination, Dr. Paret stated that there was evidence that Dr. Miller's administration of the

MMPI was invalid based on the L (Lie) scale, which showed the Defendant was faking good based on her elevated L scale score of 91. (Tr. 71). According to Dr. Paret, this score indicates that Defendant was trying to appear <u>not</u> mentally ill. (Tr. 72). Dr. Paret concluded that based upon his clinical tests, the Defendant was not malingering, or faking either good or bad, when she was evaluated by himself, but she was attempting to appear <u>not</u> mentally ill during her evaluation with Dr. Miller. (Tr. 72).

Dr. Paret testified that on or about August 2011, one month before this hearing, Defendant stated she believed her success at a criminal trial would get all her money and property back. (Tr. 73). Dr. Paret confirmed that this statement supports his diagnosis and opinion of incompetency. He stated that Defendant is highly delusional in her fixed thought processes and she is going to continue perseverating them. (Tr. 74). Only recently did Dr. Paret find Defendant had pressured speech and that she was increasingly delusional. Defendant has shown typical signs of tracking, or using the past to make sense of the present, and is unable to differentiate between the past and present, which greatly affects her competency. (Tr. 77). Dr. Paret also testified that Defendant was not on any antipsychotics. (Tr. 79).

In conclusion, Dr. Paret found,

> [a]fter conducting a very extensive clinical review with Miss Giraldo, [and] performing two memory tests, they gave me the ability to believe without any sort of difficulty that what she was saying, reporting were truthful; and after looking at the results that were given to me by the tests that I administered and speaking to her in regards to specifics in regards to competency, ([e.g.,] does she have a factual understanding of what's going on, does she have a rational understanding of what's going on, and, putting those two things together, would she be able to assist defense counsel), I concluded that Miss Giraldo is not competent to stand trial. (Tr. 78).

On cross examination by Assistant United States Attorney, Mr. Jeffrey Michelland, Dr. Paret

stated that he had reviewed Defendant's medical and mental health history, at least from 2003, and that as far as he knew, he was the first doctor to diagnose Defendant with schizophrenia. (Tr. 83). Additionally, Dr. Paret stated that Defendant consulted with him on two occasions, specifically, January 12 and 13, 2011.[3] (Tr. 83). Dr. Paret confirmed that he had not evaluated or observed Defendant over a six month period of time. (Tr. 85). He indicated that usual onset of schizophrenia in women is between the ages of 25 and the mid-30's, although, Defendant at age 56 has never before been diagnosed with schizophrenia. (Tr. 86).

Dr. Paret testified that Defendant has her real estate license and was able to take the exam, administered in English, and receive her license, which required a fairly high degree of competency. (Tr. 87-88). Additionally, he stated that Defendant engaged in numerous financial transactions, business partnerships, and has no social occupation dysfunction. (Tr. 87). Currently, Defendant is going to school to become a paralegal. (Tr. 88).

Dr. Paret testified about his findings with regard to the PAI test. He stated that, "the highest score on her profile was persecutory thoughts, which indicated [Defendant] may harbor delusional beliefs, as suspected during evaluation." (Tr. 95). On further cross examination, Dr. Paret testified that "some people who are schizophrenic or who have been diagnosed [as such] can be competent." [4] (Tr. 97). Dr. Paret confirmed that Dr. Miller conducted her evaluations with at least a week in between Defendant's visits. (Tr. 99). He suggested that the discrepancy between the malingering test

---

[3] Counsel cites to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 4th ed. p. 298 published by the American Psychiatric Association, under the subheading schizophrenia and other psychotic disorders. It states that, "the essential features of schizophrenia are a mixture of characteristic signs and symptoms, both positive and negative, that have been present for a significant portion of time during a one-month period or for a shorter time if successfully treated, with some signs of the disorder persisting for at least six months." (Tr. 83-84).

[4] Counsel cites to DSM-IV 4th ed. p. 686, which under the subheading of 'Diagnostic Features' states, "the clinician should assess the stability of personality traits over time and across different situations. Although a single interview with a person is sometimes sufficient for making the diagnosis, it is often necessary to conduct more than one interview and to space these over time." (Tr. 97).

results that Dr. Miller obtained and the outcome of his own analysis, was due to Defendant's newly formed belief that she's going to get all her money and land back, and that people were dying as a result of this prosecution. (Tr. 101). Accordingly, Dr. Paret suggested that the Defendant may have wanted to concentrate and withhold information sufficiently, presenting herself as someone that she's not, in order to be found competent. (Tr. 103). He testified, "[i]ndividuals that suffer from a delusional disorder have the ability to concentrate when it's necessary for them to do so." (Tr. 110-11).

During Dr. Paret's questioning and evaluation, the Defendant never exhibited any difficulty in understanding him. (Tr. 113). However, Dr. Paret further testified that there were times when he asked the Defendant questions with respect to the court system and proceedings, and he was "hard pressed [to] receive anything that was linear and not under a delusional belief system." (Tr. 117). Defendant's answers to questions regarding the trial process were correct within their own framework of her belief system, but they were not a typical response. (Tr. 118). Dr. Paret hypothesized that Defendant's delusional system had changed and now she wants to go to trial, and wants to feel competent. (Tr. 119). As recent as a week before Dr. Paret's testimony, Defendant indicated that she was unhappy with his finding of incompetency. (Tr. 123-24).

In regards to questioning about his PAI test, Dr. Paret stated that he did not rely on its results because they were invalid. (Tr. 124). He stated that he could not rule out narcissistic personality disorder; and that two of the five criteria were met for atypical schizophrenia, including: delusions and disorganized speech. (Tr. 127-28). Dr. Paret determined that Defendant is working on the delusional system of perseveration and she is unable to change it. (Tr. 132). He concluded that Defendant is unfit to stand trial and effectively assist her counsel.

Dr. Christina Miller is a licensed Florida psychologist in private practice.[5] She conducts competency evaluations for the defense bar, the state and the courts, at both the state and federal levels. (Tr. 140). She has completed approximately 500 competency evaluations, including approximately 15-20 at the federal court level. (Tr. 140-41). She completes at least forty hours of continuing education every two years and is currently practicing in Miami, Florida. (Tr. 141). The Court admitted Dr. Miller as an expert in the area of forensic psychology without objection by the defense. (Tr. 144). Dr. Miller reviewed Defendant's records, as well as Dr. Perat's psychiatric evaluations and report, and her own testing in this case. (Tr. 145-46).

The Defendant was examined by Dr. Miller on two separate occasions, the first was on June 25, 2011 and the second interview was on July 1, 2011. (Tr. 144). Dr. Miller described the procedure for making a competency evaluation, which includes: reviewing all documents, contacting both attorneys, contacting a family member, and doing a background history. (Tr. 145). She also reviewed Defendants medical and mental health records from 2003. (Tr. 148). In speaking with Defendant's attorney, Dr. Miller stated that, "Miss Elm...had difficulty with keeping [Defendant] on track as far as with the issues regarding her charges... [and] would not focus on topics." (Tr. 148-49). Dr. Miller also testified that Counsel had concerns with Defendant's religious ideas, bizarre thinking, and

---

[5] Dr. Miller obtained her bachelor's degree in psychology, *cum laude*, in 1977 from the University of Miami with a G.P.A. of 3.7. She received her Master's degree in educational counseling psychology, *magna cum laude*, in 1979 from the University of Miami with a G.P.A. of 3.9. She then received her Ph.D. in 1997 specializing in clinical and forensic psychology, as a distinguished doctoral student, *summa cum laude*, from the University of Miami with a G.P.A. of 3.9. Dr. Miller has been a diplomat of the American College of Forensic Examiners for ten years, and a member of the American Psychological Association and the Florida Psychological Association, both in the organizations' forensic divisions. She is also a member of the American Law Society and the Dade County Psychological Association. She has been an adjunct professor for doctorate level forensic psychology courses at Carlos Albizu University since the late 1990's. Her past work experience includes: psychiatric hospitals evaluating adults and juveniles, employment as a Master's level clinician and a mental health supervisor in the state correctional system, and she completed her post doctoral internship at the South Florida Evaluation Treatment Center, where she evaluated defendants after they were deemed incompetent for restoration purposes. Dr. Miller has been in private practice since 2001. (Tr. 138-44). Dr. Miller is fluent in both Spanish and English. (Tr. 139).

grandiosity. (Tr. 148). At Defendant's first interview with Dr. Miller, Defendant's demeanor was appropriate, she maintained and sustained good eye contact, she was engaging, cooperative, respectful, and able to follow instructions. (Tr. 151). The interview was conducted in Spanish and the Defendant indicated that she had no difficulty understanding Dr. Miller. (Tr. 152).

Upon review, Dr. Miller realized inconsistencies between the information Defendant gave Dr. Paret and herself. Specifically, there were several aspects of Defendant's background history which contained variations, including that she had eight siblings and that her ransom money from her alleged kidnaping was $500,000. This differed from what Defendant previously indicated to Dr. Paret, which was that she had ten siblings and was held for $5 million in ransom. (Tr. 153).

After Dr. Miller's preliminary interview with the Defendant to determine her orientation, ability to comprehend directions, and willingness to participate in evaluations, Dr. Miller began administering her tests. The first test administered was the Miller Forensic Assessment Test (M-FAST), which assesses whether an individual is exaggerating or faking a psychiatric symptom, mostly symptoms associated with psychosis. (Tr. 155). Dr. Miller determined that Defendant was not faking, and based on her review of Dr. Paret's malingering tests, she had no reason to believe the results were not correct or ethical. Therefore, Dr. Miller did not proceed with further malingering tests. (Tr. 155-56). During the M-FAST, Defendant indicated to Dr. Miller that she understood English and read English better than she was able to speak it, although Dr. Miller continued to translate the tests into Spanish. (Tr. 156).

Dr. Miller's next two tests included the Beck Anxiety Inventory and the Beck Depression Inventory, both designed to measure the presence and/or severity of anxiety and depression in adolescents and adults. (Tr. 157). Upon evaluation, Dr. Miller determined that Defendant was not

presenting with active symptoms of depression or anxiety, and these responses were consistent with her presentation and demeanor on the day she was questioned. (Tr. 157).

The Trauma Symptom Inventory (TSI) was also conducted by Dr. Miller in order to assess the presence of post traumatic stress disorder based on Defendant's allegations that she had been kidnapped by guerillas in Columbia. (Tr. 158). This test is based on a 100 item self- report assessed on a Likert scale which measures distress, and on a Validity scale which measures a response style. (Tr. 159). According to Dr. Miller, the result of the TSI did not reflect symptoms associated with psychological trauma, associated with PTSD. (Tr. 160).

Dr. Miller then administered the Minnesota Multiphasic Personality Inventory (MMPI-2) which assesses psychiatric symptomatology or psychopathology. (Tr. 160). She stated, "[w]hen there is a doubt as to diagnosis, this is the test of choice among most mental health professionals." (Tr. 164). It has both Validity and Clinical scales, wherein the Clinical scale measures depression and also can measure schizophrenia. This test is a 500 question, true and false exam that is compatible with a subject who has basic reading skills. The Defendant indicated that she graduated from high school and attended the University of Colombia, showing she was able to complete the test according to the requisite reading level. (Tr. 160). The results were invalid and could not be interpreted, and the Lie scale was elevated. Dr. Miller indicated that this is possibly resulting from the individual "having possible reading difficulties, was faking [good], was defensive or suffered from severe psychopathology." (Tr. 161). However, Dr. Miller did not believe that Defendant had reading difficulties, and Defendant showed no signs of severe psychopathology during the evaluation. (Tr. 161). Further, Dr. Miller stated, "It is my clinical and professional opinion, that [Defendant]'s presentation and history best fits the criteria for narcissistic personality disorder…attempting to

present yourself in the best possible light…[and] exaggerate[ing] positive characteristics." (Tr. 163). However, because this test was invalidated, it was not used to substantiate anything in [Dr. Miller's] report. (Tr. 165).

Another test performed by Dr. Miller on the first interview day was the Cognistat test, administered in Spanish, which measures through a series of tasks, possible neurocognitive deficits in language, memory, construction ability, and the ability to perform mental calculations, reasoning, attention, and orientation. (Tr. 166). According to the results, Defendant scored in the average, unimpaired range. (Tr. 166). Further, there were no signs of perseveration. (Tr. 168).

The Repeatable Battery for Assessment (RBANS) was the next test administered, in Spanish, which assesses areas such as attention, visual, spatial, constructional abilities, language, immediate memory and delayed memory. (Tr. 169). Dr. Miller indicated that Defendant scored in the average range, based on her age and educational experience. (Tr. 171). Defendant's total scale score was a 105, placing her above the total mean score of 90.5 with a standard deviation of 12, based on individuals with a high school education, between the ages of 50-69. (Tr. 173). Furthermore, Defendant scored a 109 for immediate memory, 102 for visual/spatial construction, 99 in language, 106 for attention, and 105 under the delayed memory category, again measured against a 90.5 average. (Tr. 172). These results indicated there were no scores in the deficit range. (Tr. 173).

After completing the mental status interview on the first interview day, Dr. Miller concluded that Defendant was oriented, alert, able to read, comprehend, express herself appropriately, and wasn't responding to internal stimuli. (Tr. 174). The Defendant was cognitively intact and was not impaired. (Tr. 175). Dr. Miller also indicated that the MMPI was the only test she was unable to score while Defendant was at the office, because "the MMPI is very sensitive to score." (Tr. 176).

However, according to the "the Cognistat, RBANS, Beck Depression, Beck Anxiety, and the trauma symptom checklist, there did not appear to be any indication of psychopathology." (Tr. 176).

On the second interview date, the Georgia Court Competency Test (GCCT) was integrated into four (4) hours of competency interviewing and questioning, and administered in Spanish. (Tr. 178). The GCCT is a structured interview process which relies on factual information to make an evaluation. (Tr. 178). The areas of inquiry included in this interview session, included general legal knowledge and an assessment of her understanding of the courtroom layout. The Defendant correctly identified where the judge, jury, and prosecution were located, and also identified where Ms. Elm would sit, placing herself next to her attorney. (Tr. 178-79).

The Defendant then went on to describe her charges, including details about the alleged wire transferring, correctly describing what it meant. (Tr. 180). Dr. Miller explained how the Defendant described that she initially started doing business with one bank, which had bought the other, and that some of the offices of the banks were located out of Florida, specifically Cincinnati. Defendant further explained that all communication went through fax, email, and phone, which if provided in this manner, is considered "wire transferring." (Tr. 181). Defendant explained she was accused of falsifying income tax information and using straw borrowers to obtain fraudulent loans. (Tr. 181). Furthermore, Defendant stated she was accused of money laundering, falsifying legal documents, illegal transfer of funds, and provided explanations of all charges in depth. (Tr. 183). Subsequently, the Defendant asked, "[c]an we go through the indictment step by step?" and stated that she read [the indictment] and understood English, but did not feel comfortable speaking it. (Tr. 181). Dr. Miller then stated that the Defendant told her side of the story and expressed that the Government, specifically Agent Viola, had failed to conduct a comprehensive and correct investigation due to her

failure to interview key people. (Tr. 182).

The Defendant also understood that communications with her attorney were privileged when prompted for details about conversations she has with Ms. Elm. (Tr. 182). The only part Defendant was not unsure of was the number of years she could be given, or how many jurors would be present (12 or less). (Tr. 189-90). Defendant did however describe that there would be jurors and a foreperson at trial, and explained the role of the jury. The Defendant stated that the judge will not take sides, and also expressed that she was not in agreement with being found incompetent by the court. Furthermore, the Defendant understood what a plea would entail and explained that she was not receptive to a plea that would entail any jail time. The Defendant maintained her innocence throughout all questioning by Dr. Miller. (Tr. 190).

Dr. Miller then testified that it the inconsistencies between her interviews and Dr. Perat's testing could be explained by the amount of time that passed between the [alleged unlawful] events and Defendant's interviews. (Tr. 185). When discussing religion, Defendant indicated that she did not have special powers, as reported in Dr. Perat's report, however all the information to describe what Defendant has can be found in the Bible. (Tr. 187). She also stated that it is her belief that people should try to better themselves economically, and this was one of the reasons why she came to this country. (Tr. 188). When asked about the role of God or religion in the legal proceedings, Dr. Miller quotes her translation of Defendant's statements during the interview,

> I'm aware that the judicial system does not care about my underlying
> motivation or ideas. The judicial system is a practical system. There's
> separation of religious belief in the legal system in this country. The
> legal process requires tangible proof. It is not subjective. As to God,
> he gave us all the potential to succeed if we work hard. I am working
> hard on this case… (Tr. 194).

Dr. Miller testified that she did not find any signs of severe psychopathology, or any signs

of being impaired in Defendant throughout her evaluations. (Tr. 194). Dr. Miller assigned a diagnosis on Axis I of acculturation problems, consistent with Dr. Perat; and on Axis II Dr. Miller assigned a diagnosis of narcissistic personality disorder. (Tr. 195). Dr. Miller did not find delusions or hallucinations when discerning characteristic symptoms of possible schizophrenia. (Tr. 196). However, Dr. Miller did indicate that Defendant was stable and her behavior was consistent with someone who was not depressed. (Tr. 196-97).

Dr. Miller considered statements Defendant made to a psychologist in 2003, which establishes that Defendant has signs of a personality disorder as shown through self-reports. (Tr. 198). Dr. Miller also clarified that personality disorders are an enduring, pervasive, longstanding pattern of behavior and not a mental illness. (Tr. 198). The psychologist/clinician from the 2003 evaluations reported no evidence of any psychotic process, although Defendant was diagnosed with PTSD, depression, and anxiety disorder.[6] (Tr. 208).

Dr. Miller testified that Defendant is free from any mental disease or defect making her incompetent to the extent she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense. (Tr. 203). Additionally, Dr. Miller stated Defendant is able to control herself, aid and assist her attorney, understand the nature and purpose of the court proceedings, understand her own position, the role of her attorney and others, disclose pertinent facts, and the ability to advise and accept advice of her attorney. (Tr. 203-05). Dr. Miller confirmed there was no cognitive impairment and that Defendant is capable of making decisions in a rational and logical manner. (Tr. 205). Dr. Miller also confirmed that the Defendant has the ability to

_____

[6] It is unclear the education and background of the clinician. Dr. Miller testifies she does not recall if the evaluator from 2003 was a Master's level clinician or Doctoral level or social worker. She was, however, a mental health professional that saw Defendant for several sessions. (Tr. 234).

understand her legal rights, testimony of witnesses, her right to testify and against self-incrimination, the range and nature of penalties indicating that she could be facing several years in prison. (Tr. 205). In conclusion, Dr. Miller stated that Defendant showed some overvalued ideas, religious preoccupation, and presented with grandiosity, all consistent with a diagnosis of narcissism. (Tr. 209). She also stated, "[i]t was like Dr. Perat and I evaluated two different individuals." (Tr. 209).

On cross examination, Dr. Miller testified that stressors can trigger depression, anxiety or other conditions that would contribute to an individual not being competent at the time. (Tr. 211). When asked about the MMPI test, Dr. Miller confirmed that it is the only accurate test for delusions and also that the test returned an invalid profile, which is uninterpretable. Dr. Miller also stated that there is no basis for a diagnosis of any severe psychopathology because she cannot make conclusions based on the invalidated profile. (Tr. 217). Dr. Miller later in her testimony, reported that she

> did not rely on any one test for a diagnostic criteria, so assuming that the MMPI was invalid and therefore I was not able to make a diagnosis of schizophrenia, I have made such diagnosis many, many times without the assistance of any instrument. It is always good to have it validated with an instrument. It is not necessary. (Tr. 233).

Dr. Miller indicated that she did not have access to information which would confirm or deny Defendant's existence of delusions throughout her life based on the fact that she was unable to contact family members, and there is limited availability of evaluations in Columbia and the United States. (Tr. 213-15).

Additionally, Dr. Miller confirmed that while both she and Dr. Perat identified a fair amount of narcissism and grandiosity, she was only able to identify this from the legal documents provided to her, including interviews of witnesses and secondhand reports from her "dealings." (Tr. 221). When questioned by prosecution about Defendant's desire to be found competent, Dr. Miller

acknowledged that Defendant wants her day in court, for the court to hear her side of the story, and she could present her case. (Tr. 226).

In regards to Dr. Perat's reports, findings, and diagnosis, Dr. Miller did not agree because the Defendant was not "tracked" for more than a month, and thus Dr. Perat's findings were not within the MET criteria. (Tr. 235). However, based on Dr. Miller's record review, interview, and Defendant's reports stemming from childhood and adolescence, Dr. Miller confirmed her professional opinion that the Defendant has a narcissistic personality disorder. (Tr. 235). After considering the psychologist's report from 2003 at length and also considering her own evaluations as well as the evaluations of Dr. Perat, Dr. Miller believes that Defendant is competent to proceed or to stand trial. (Tr. 203).

## STANDARD OF REVIEW

"Unquestionably, due process requires a defendant to be competent to stand trial." U.S. v. Derisma, 2011 WL 3878367 *1 (M.D. Fla. June 27, 2011) (citing U.S. v. Andrews, 469 F.3d 1113, 1117 (7th Cir.2006) (quoting U.S. v. Collins, 949 F.3d 921, 924 (7th Cir.1991)). *See also* Cooper v. Oklahoma, 517 U.S. 375, 384–85, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process.") (internal quotation and citation omitted); Eddmonds v. Peters, 93 F.3d 1307,1314 (7th Cir.1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.").

Incompetency means "suffering from a mental disease or defect rendering [defendant]

mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The Defendant assumes the burden of proof to establish his incompetency by a preponderance of the evidence. Derisma, 2011 WL 3878367 at *1 (citing Cooper, 517 U.S. at 355); Battle v. U.S., 419 F.3d 1292, 1298 (11th Cir.2005); Carter v. U.S., 2:09–CV–444–FTM–29DNF, 2010 WL 1480365 *3 (M.D. Fla. Apr. 6, 2010). The Defendant is entitled to no presumption of incompetency. Id. "The legal test for competency is whether the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.' " U.S. v. Cruz, 805 F.2d 1464, 1479 (11th Cir.1986) (quoting Dusky v. U.S., 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)). "[T]he mere presence of a mental disease or defect is not sufficient to render a defendant incompetent ...." U.S. v. Rothman, No. 08–20895–CR, 2010 WL 3259927 at *7 (S.D.Fla. Aug. 18, 2010) (citing U.S. v. Liberatore, 856 F. Supp. 358, 360 (N.D. Ohio 1994)). "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." U.S.v. Williams, 2007 WL 1655371 at * 5 (M.D. Fla. June 7, 2007) (internal citation and quotation marks omitted); see also Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995) (noting that "not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted).

Psychiatric and psychological examinations are governed by 18 U.S.C. § 4247(b), which provides in pertinent part:

A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner. Each examiner shall be designated by the court....

Pursuant to 18 U.S.C. § 4247(c), report of examination shall include:

(1) the person's history and present symptoms;

(2) a description of the psychiatric, psychological, and medical tests that were employed and their results;

(3) the examiner's findings; and

(4) the examiner's opinions as to diagnosis, prognosis, and

(A) ... whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Once there is an evaluation, the proceedings are governed by 18 U.S.C. § 4241(d), which provides that if, after a hearing, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General .... for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Derisma, 2011 WL 3878367 at *3.

In determining whether the defendant has sufficient present ability to consult with her lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since [she]

should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent [her] which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against [her]; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise [her] constitutional right to take the stand, and if [she] does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with [her] attorneys and to postulate questions to the witnesses through counsel." Derisma, 2011 WL 3878367 at *3 (citing U.S. v. Passman, 455 F. Supp. 794, 796–97 (D.D.C.1978) (citations omitted). "In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him." U.S. v. Makris, 535 F.2d 899, 908 (5th Cir.1976). [7] "In determining a defendant's competency to stand trial, the Court may rely one of two competing competency opinions given by qualified experts." U.S. v. Gerlt, 2011 WL 110790 * 1 (W.D. Mo. Jan.13, 2011) (citing U.S. v. Ghane, 490 F.3d 1036, 1040 (8th Cir.2007)).

"[A] criminal defendant must lack either 'a sufficient present ability to consult with his lawyer

---

[7]     All decisions of the Fifth Circuit prior to October 1, 1981, have been adopted as decisions of the Eleventh Circuit. Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir.1981).

with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.' " U.S. v. Miller, 531 F.3d 340, 350 (6th Cir.2008) (quoting Drope v. Missouri, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)). "In determining competency, the district court may rely on numerous factors, including expert medical opinions and the court's observation of the defendant's demeanor. Low intelligence or a mental deficiency does not render a defendant incompetent *per se*." Derisma, 2011 WL 3878367 at *3 (citing U.S. v. Robinson, 253 F.3d 1065, 1068 (8th Cir.2001) (internal citations omitted).

In United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir.1993), for example, the Eleventh Circuit Court of Appeals noted that even perfectly competent defendants often do not fully comprehend the intricacies of some of the theories offered by their lawyers, and stated, "all that is required is that [the defendant] had a rational as well as factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding." Derisma, 2011 WL 3878367 at *4; *See also* Median v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995) (stating neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial). The Court reviews the evidence in this case with these standards in mind.

# DISCUSSION

The Defendant's Counsel claims the Defendant is not competent to stand trial based upon the opinion of Dr. Paret who spent two days examining the Defendant before submitting his report. The Government argues that the Defendant is competent to stand trial and relies on the opinion of Dr. Miller who opined the Defendant met the criteria for competence to stand trial.

In his Report, Dr. Paret concluded:

> [a]fter conducting a very extensive clinical review with Miss Giraldo, after performing two memory tests, they gave me the ability to believe without any sort of difficulty that what she was saying, reporting were truthful; and after looking at the results that were given to me by the tests that I administered and speaking to her in regards to specifics in regards to competency, does she have a factual understanding of what's going on, does she have a rational understanding of what's going on, and, putting those two things together, would she be able to assist defense counsel, I concluded that Miss Giraldo is not competent to stand trial.

(Tr. 67). However, some of Dr. Paret's own test results conflict with his opinion. Dr. Paret states that as far as he knew, he was the first doctor to diagnose Defendant with schizophrenia. (Tr. 71). He indicated that usual onset of schizophrenia in woman is between the age of 25 and the mid-30's. (Tr. 74). The Defendant at age 56 has never before been diagnosed with schizophrenia.

Dr. Paret's test results demonstrate that the Defendant has a Full Scale IQ of 89 which falls into the low average intelligence, and has a verbal IQ score of 91 which falls into the average intelligence range. (Defense Ex., B, p. 15). The results of the Plaintiff's Design Fluency Test demonstrated that the more complex the test became, the better the Defendant performed on the exam. Dr. Paret also testified that Defendant has her real estate license and was able to take the exam, administered in English, and receive her license, which required a fairly high degree of competency.

(Tr. 74-75). Additionally, he stated that Defendant engaged in numerous financial transactions, business partnerships, and has no social occupation dysfunction. Currently, Defendant is going to school to become a paralegal. (Tr. 75). Thus, based upon Dr. Paret's test results it is apparent to the Court that the Defendant is capable of handling complex issues and successfully completing complex projects. Such ability and mental capability does not correspond to the assessment of a defendant who is not capable of assisting in her own defense.

While Dr. Miller diagnosed the Defendant with Narcissistic Personality Disorder she found her competent to stand trial. Narcissistic Personality Disorder is defined as "[a] pervasive pattern of grandiosity, need for admiration, and lack of empathy that begins by early adulthood and is present in a variety of contexts." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (2000). However, the Court notes that a mere diagnosis of a mental disorder is not sufficient to declare a defendant incompetent to stand trial. Markis, 535 F.3d at 909.

In determining that the Defendant is competent to stand trial, Dr. Miller interviewed the Defendant for four hours and administered the Georgia Court Competency Test (GCCT). The GCCT is an objective measure that assesses: (1) general knowledge, (2) courtroom layout, and (3) specific legal knowledge. (Gov't. Ex. 2, p. 16). The GCCT cutoff score is 69. Id. The Defendant scored a 100. Id.

While Dr. Paret opined the Defendant could not define the roles of the those involved in the trial process, judge, attorneys, jury, and witnesses, Dr. Miller's test results established that the Defendant was able to properly identify the role of her attorney, as well as the role of the prosecutor and judge and provide a proper description and understanding of what each role entailed. Id. at 16-17.

Dr. Miller's Report states that the Defendant described the role of the judge as someone who listens to both sides, interprets the law, reviews the evidence, and submits the evidence to a jury. Id. at 17. She stated the jury reviews the evidence and votes if the person is guilty or innocent. Id. The Defendant also noted that the jurors did not know anything about the individuals involved in the trial. Id. The Defendant told Dr. Miller that her attorney is there to help her fight the charges and to defend her and that she communicates with her attorney often. Id. She also stated that the prosecutor is just doing his job and that it not personal against her. Id. Based upon the responses provided on GCCT administered by Dr. Miller, it is clear that the Defendant understands the process and the role of the parties involved.

The Defendant was also able to provide a description of the charges against her and indicated that she knew she was facing eighteen (18) criminal counts in federal court including laundering money, falsifying legal documents, wire use for illegal transfer of funds, and recruiting straw buyers. (Gov't. Ex. 2, p. 16). Dr. Miller also opined that the Defendant understood the consequences if she were to be found guilty or plead guilty to those charges. Id. at 18. Dr. Miller concluded her Report by stating that based "[u]pon review of the interviews conducted with [the Defendant], testing results, collateral interviews with both attorneys, as well as review of available documentation, it is the advisory opinion of this clinician that Maria Elena Giraldo meets criteria for competence to proceed (competence to stand trial) at this time."

Based upon the testimony of the Experts, the Court finds Dr. Miller's Report to be more credible and revealing of the Defendant's true competency to stand trial. See Gerlt, 2011 WL 110790 at * 1. (holding "[i]n determining a defendant's competency to stand trial, the Court may rely one of two competing competency opinions given by qualified experts."). The results of Dr. Miller's testing

and evaluation clearly demonstrate that the Defendant is able to define the roles of all of the parties involved, has sufficient grasp of the charges against her, and the ultimate consequences she may face should she be found guilty of said charges.

The Court also observed the Defendant's behavior during the day long hearing. The Defendant's behavior was appropriate for the circumstances. The Defendant was engaged, focused and alert throughout the entire day and she took copious and what appeared to be well organized notes throughout the entire hearing. Although the Defendant suffers from Narcissistic Personality Disorder and has been diagnosed with schizophrenia, she is not debilitated by these processes to the extent that she cannot stand trial. The evidence presented to the Court established that she is able to follow and understand the trial process.

Thus, based upon the testimony and exhibits presented to the Court, along with a consideration of the respective expert reports and the Court's own observations of the Defendant's behavior, the Court respectfully recommends that the Defendant does not suffer from a mental diease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense. Under the totality of the circumstances it is recommended the Defendant is competent to stand trial.

Accordingly, it is now

**RECOMMENDED:**

The Court should enter an Order finding the Defendant Maria Elena Giraldo is **COMPETENT** to stand trial.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___24th___ day of October, 2011.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record